OPINION. Rice, Judge: The issue to be decided is whether decedent, upon the releases given to Needles and Sundheim in 1945, incurred a deductible loss in that year for payments which he made to the Bank from January 13, 1933, through October 27, 1945, in the amount of $31,239.43 and for two payments to the Bank totaling $600 he made in November and December, 1945. Petitioner’s claim that they are entitled to the deduction is based on the theory that the series of notes executed from July 16,1930, through May 5,1932, were accommodation notes. They maintain that decedent became an accommodation maker and that Kornfeld, Sundheim, and Needles, and (after Komfeld’s death) Sundheim and Needles, became the accommodated parties; that they were therefore liable on the note; and that the amounts decedent paid to the Bank on the note from 1933 through 1945 constituted a loss under section 23 (e) (1) or (2), or a bad debt under section 23 (k) (1) of the Internal Revenue Code.[1] Respondent contends that decedent was not an accommodation maker, that he was primarily liable on the note, that the note evidenced his own personal indebtedness to the Bank, and that a taxpayer cannot deduct as a loss or bad debt the amount he repays on his own indebtedness. 56 Pa. Stat. § 66 (N. I. L. § 29) provides: An accommodation party is one who has signed the instrument as maker, drawer, acceptor or indorser, without receiving value therefor, and for the purpose of lending his name to some other person. Who is the accommodated party is a question of fact, and, except in certain instances not present here, parol evidence can be introduced to show lack of consideration between the accommodated and accommodating parties. See Hess v. Gowen, 11 A. 2d 787 (Super. Ct. Pa. 1940); Western National Bank of York v. Levin, 200 A. 71, 831 Pa. 113 (1938). The original note for the debt of $125,000 between decedent and the Bank was executed by decedent as the maker, and was evidence of a loan decedent obtained from the Bank on October 10, 1927. This was a demand note, and, as security, decedent pledged to the Bank the Kornfeld mortgages aggregating $180,000. A recital of these pledged mortgages was contained in the note. Petitioners maintain that when these mortgages were not paid on their due date, and decedent received an offer for the purchase of the four parcels from a real estate broker in Atlantic City, decedent agreed not to foreclose the mortgages and accept the offer if Kornfeld, Needles, and Sundheim would undertake to pay off decedent’s liability to the Bank. We feel that petitioners have failed to prove that this was the exact nature of the transaction. Decedent’s testimony on this point was as follows: Q. Was that offer rejected by the owners of the property? A. Rejected by me, because simple as it is, these people down there didn’t want me to foreclose because they panted to pay it off in the installment plan, see, and they said that it wouldn’t be fair to those men because they were Samaritans and very good people, very liberal, and I should not foreclose on them because- Q. Let me ask you: Did you give consideration to foreclosing on the property? A. Oh, yes. Oh, yes. I had until- Q. Just answer my questions. But you refrained from foreclosing, I understand? A. I did on account of they gave the $40,000 to start with, see. Q. Well, now, did they make any promises to you? A. They promised me that they would pay it, whatever it was, that they would pay it. I would never have to worry about it because they would see that they paid it. Q. That they would pay what, Mr. Schwehm? A. The mortgages. Q. The mortgages? Was anything said about your note to the bank? A. Why, yes. They went up the bank and done all this work — all this work was done by the Broad Street Trust Company. Q. Was their promise to pay your note to the bank? A. That is right. Q. Now, we speak of “they”. Whom do you mean by “they”? A. You see, what they had to do is to pay— Q. Who is “they”, Mr. Schwehm? A. The bank, they had the notes. Q. Yes, but the owners of the property were Mr. Sundheim and Mr. Needles and Mr. Kornfeld? A. Yes; and they are the ones that agreed to pay for it. They said, “It is nothing to worry about, we will pay for it. And we will see that you get the money.” Q. After they made that promise to you you refrained from foreclosing, is that correct? A. That is right, yes. Q. Did they put their promise in writing? A. No, they did not. I know that Mr. Salus, he was the man that was there, and he said it would be all right because they have been reputable men and they will pay it. Q. And who gave you the promise to pay? Did Mr.- A. Mr. Sundheim, Mr. Needles, and Mr. Salus too, he said that he would- Such statements as are indicated by the above testimony as having been made to decedent may be interpreted in one of two ways: On the one hand, they could indicate that those parties were undertaking to pay the Bank, and, on the other, that they were undertaking to pay off the mortgages, and that such money would be available to reduce the indebtedness to the Bank. We feel that the record of this case indicates that the latter interpretation is the one which was meant by the parties involved. The minutes of a meeting of the board of directors of the Bank held on June 18,1930, show the following: Upon motion, resolved that we grant an extension of six months on loan of Ernest Schwehm for $125,000, providing $40,000 reduction be made and renewal note bear the endorsements of Max Kornfeld, Harry Sundheim and Needles, and also that receipted,- the tax bill for the first half of 1930 be produced. The treatment of the entire transaction by the Bank also indicates that it still considered decedent the primary obligor for the debt. The notes still were drawn with decedent as the maker, and recited on the face that the Kornfeld mortgages were pledged as collateral security for the debt. As payments were made on these mortgages by Kornfeld, Sundheim, and Needles, the Bank applied the payments to the principal due under the mortgages, and then also credited such amounts against the indebtedness appearing on the notes. The Bank’s records listed the indorsement of Kornfeld, Needles, and Sundheim, and subsequently Needles and Sundheim, as collateral. While it is true that the Bank in 1936 instituted proceedings against Sundheim and Needles on the promissory note dated May 5, 1932, it must be remembered that from at least 1927 through the date of the hearing in the instant case decedent was a director of the Bank. Sundheim and Needles each affirmatively alleged in his affidavit of defense that he had indorsed the note for the accommodation and benefit of the decedent and impleaded the decedent as a defendant. Such suit never came to trial and dragged on until finally settled in 1945 by a payment of $3,250 by Sundheim and Needles. Needless testified that this amount was paid on Sundheim’s advice merely to forego the expense of a law suit. Under all the facts discussed above, plus all others appearing in the record, we feel that petitioners have failed to show that decedent, in fact, was an accommodation maker of the note. The debt arose from a loan by the Bank to decedent which was not paid, and time for payment was extended when decedent obtained the indorsements of Kornfeld, Sundheim, and Needles. The evidence has failed to show that there ever was a substitution of the party or parties primarily liable on the debt, and petitioners have failed to show that decedent did not, at all times, remain the primary obligor. Under such circumstances, we feel that respondent did not err in refusing to allow any deduction for the year 1945 based on the payments to the Bank by decedent on said note, since a taxpayer may not deduct payments made on his own debt. Decision will be entered for the respondent. SEC. 23. deductions FROM GROSS INCOME. ****••• (e) Losses bv Individuals. — In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise— (1) if incurred in trade or business ; or (2) if incurred in any transaction entered into for profit, though not connected with the trade or business; * * * ****** * (k) Bad Debts.— (1) General Rule. — Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. This paragraph shall not apply in the case of a taxpayer, other than a bank, as defined in section 104, with respect to a debt evidenced by a security as defined in paragraph (3) of this subsection. This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a nonbusiness debt, as defined in paragraph (4) of this subsection.